Louis D. ANDERSON, Plaintiff-Appellee,

v.

ELGIN, JOLIET AND EASTERN RAILWAY COMPANY, Defendant-Appellant.

No. 11424.

United States Court of Appeals Seventh Circuit.

Nov. 9, 1955.

Rehearing Denied Dec. 7, 1955.

5.   See United States ex rel. La Charity v. Commanding Officer, 2 Cir., 1944, 142 F.2d 381, 382.

Harlan L. Hackbert, Chicago, Ill., Stevenson, Conaghan, Velde & Hackbert, Chicago, Ill., of counsel, for appellant.

Bruce Parkhill, Chicago, Ill., for appellee.

Before DUFFY, Chief Judge, and MAJOR and SWAIM, Circuit Judges.

MAJOR, Circuit Judge.

This action was brought by the plaintiff under the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for injuries incurred in the course of his employment by the defendant. The case was tried to a jury which rendered a verdict in favor of the plaintiff. From a judgment predicated thereon defendant appeals.

The principal issue argued here is that the trial court erred, in its refusal to direct a verdict in favor of the defendant or, in the alternative, in its refusal to enter a judgment notwithstanding the verdict. This argument rests upon the premise that the proof was insufficient to take the case to the jury either on the issue of defendant's negligence or of a causal relationship between the accident as alleged and the physical condition of the plaintiff at the time of the trial. It is also contended that the court erred in its refusal of defendant's motion for a new trial, based upon certain instructions both given and refused.

Plaintiff was a switchman employed by the defendant in its mill yard at Gary, Indiana. On the morning of January 4, 1950, he reported for work at 7 a. m., and about thirty minutes later stepped from an engine on which he was riding to the ground which was covered with ice, when he slipped, fell and received his alleged injuries. Defendant's yard consisted of the railway tracks within the Gary Steel Works of United States Steel Corporation at Gary, on the southern shore of Lake Michigan, and covered an area some five miles long and two miles wide. There were 210 miles of railway track and more than 1600 switches, the largest industrial yard on the railway. Over these tracks were moved inbound shipments of raw materials and outbound shipments of finished products. There were moved daily in the yard 2200 to 3000 cars. All of the tracks and switches were used regularly, but some more often than others. The accident happened in what was called the subway district, at the edge of the place where a subway or underpass went under the tracks. At this point more ice ordinarily formed than elsewhere in the yard. About 50 switches were located in the subway district and it was one of the busiest locations in the yard.

There appears to be no question but that plaintiff at the time of the accident was engaged in the performance of his duties in the usual and ordinary manner. The crew of which he was a member was engaged in a switching operation, with plaintiff riding on the step of the engine. When the engine reached switch 13-B, it slowed down almost to a stop, plaintiff stepped to the ground which was covered with ice and, as already stated, slipped and fell. Plaintiff had previously thrown one switch, it was his duty to throw switch 13-B, and it was for this reason that the engine slowed down and

plaintiff stepped off. Plaintiff stepped off the engine on the side opposite to the switch stand. There is some dispute as to the precise manner in which plaintiff fell, which we think is immaterial. At any rate, he got up, crossed the track and performed the operation of throwing the switch. He again got on the engine and about an hour later was taken to the hospital. Eventually he was found to be suffering from herniated intervertebral disc, which allegedly resulted from the injury received in his fall on January 4.

On January 3, 1950 (the day before the accident), a cold front accompanied by freezing rain and sleet, followed later by snow, moved eastward from Chicago across northern Indiana. Past experience indicated that a storm of this severity might be expected from two to four times each year. The storm reached Gary, Indiana, about 11 p. m. Rain was frozen as it fell and soon a glaze of ice formed all over that area, including the switch yard. The storm continued during the remainder of the night. There is some variance in the testimony as to the time it ceased, but it appears to have continued until 7, and perhaps until 8 a. m. (January 4, the date of the accident).

Defendant employed a section crew (sometimes referred to as track laborers) of some ninety men in its Gary yard, about half of whom lived in shanties within the yard. Their regular shift was from 8 a. m. until 4:30 p. m., although they were subject to call for special duty at any time. When so called, it required about two hours to get the crew on the job. This crew was not called for special duty but commenced work at the regular time, that is, 8 o'clock on the morning of January 4. At that time thirty of these men were assigned to cleaning out ice from the switches in the subway area where plaintiff had been previously injured, and the other sixty were assigned to other areas in the yard. One of the duties of the section crew was to scatter calcium chloride, a salt more powerful in melting or preventing the formation of ice than ordinary salt. This salt melts the ice wherever it is spread and acts like anti-freeze. It prevents falling rain from freezing. It was brought into the Gary yard by the defendant in large quantities and was stored in section-house shanties. Some of it was stored in a switchman's shanty about twenty-five feet from the switch where the accident happened.

The evidence strongly indicates that it was the custom to spread this salt not in the yards generally but only in the points of the switches and around the switch stands. There is some testimony, however, that it was customary to scatter the salt about three feet outside the rails on both sides along the switch, that it was spread along the leads (tracks) to provide a thawing path for the men working along such tracks, and that it was spread a lot of places where men walked, to provide a footing so that they would be able to do their work without falling. Defendant's road master in charge of maintenance and construction of tracks in the Gary mill yard testified that from his experience calcium chloride used during a freezing storm such as was experienced at the time in question dissolved and served no purpose. For this reason, so he testified, it was not the practice to call out the section crew until after a storm had ceased.

Plaintiff's argument that the issue of negligence was properly submitted to the jury is bottomed almost entirely upon the contention that the defendant, charged with the duty of exercising reasonable care in furnishing its employees a reasonably safe place to work, could have removed or remedied the icy situation which caused plaintiff's fall. It is pointed out that the glaze of ice in the yard must have been known to the defendant at 11 p. m. on the day before the accident (some 8½ hours before); that the accident took place in one of the busiest parts of the yard, at a location where icy conditions were always unusually bad; that there was available to the defendant both the material and

labor by which the situation could have been remedied but that defendant failed to use the means at hand or to do anything prior to the time plaintiff received his injury.

On the other hand, defendant argues that it was not negligent as a matter of law and that there should have been a directed verdict in its favor. Its argument in condensed form is that its yards were covered with a coat of ice as a result of a severe storm which did not cease until after plaintiff had commenced his work. Such being the situation, so it is argued, reasonable care did not require it to call forth its section crew in the nighttime and during the progress of the storm, and thereby expose them to its hazards for the purpose of attempting to remove the ice which had accumulated in its yard. Moreover, it is pointed out that such an effort would have been futile during the progress of the storm, and that they were immediately assigned to the task of clearing the yard upon their arrival for work at about the same time the storm ceased, which was all that defendant could reasonably have been expected to do.

Both parties cite and discuss numerous cases in support of their respective positions on the issue of negligence. We doubt if any good purpose could be served in analyzing or discussing these cases in detail. The case most strongly relied upon by defendant is Missouri Pacific Railroad Co. v. Aeby, 275 U.S. 426, 48 S.Ct. 177, 72 L.Ed. 351, where it was held in an action under the Federal Employers' Liability Act that there was no proof of negligence and that there should have been a directed verdict for the defendant. In that case defendant's station agent received injuries when she slipped and fell upon ice which had accumulated during the night. Defendant interposed the defense of non-negligence on its part, as well as assumed risk and contributory negligence on the part of the plaintiff. The court based its decision on the defense of non-negligence, as is evidenced by the concluding statement

in its opinion, 275 U.S. at page 431, 48 S.Ct. at page 179:

"As negligence on the part of the petitioner is essential, we need not consider its contentions in respect of assumption of risk and negligence on the part of respondent."

Since the rendition of that decision and by the 1939 amendment to the Federal Employers' Liability Act, 45 U.S. C.A. § 54, the defenses of assumption of risk and contributory negligence have been abolished. While the court in the Aeby case, as shown, relied upon the defense of non-negligence, it is evident from the language employed that assumption of risk by the injured employee entered into the reasoning of the court by which it held that there was no negligence. For instance, the court stated, 275 U.S. at page 430, 48 S.Ct. at page 179:

"She [plaintiff] knew that it had rained and that the place was covered with ice and snow. Her knowledge of the situation and of whatever danger existed was at least equal to that chargeable against the petitioner. * * * The obligation in respect of station platforms and the like owed by carriers to their passengers or to others coming upon their premises for the transaction of business is greater than that due their employees accustomed to work thereon. The reason is that the latter, familiar with the situation, are deemed voluntarily to take the risk of known conditions and dangers."

Obviously, in the instant case, plaintiff at the time he went to work had knowledge of the icy condition of the yards, as did the defendant, and being familiar with the situation could be held under the reasoning of Aeby to have taken "the risk of known conditions and dangers." However, unfortunately for defendant, the reasoning of the Aeby case has been definitely repudiated by the Supreme Court in Tiller v. Atlantic Coast Line Railroad Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610. In that case the District

Court allowed defendant's motion for a directed verdict, which was affirmed by the Court of Appeals, 4 Cir., 128 F.2d 420.

The Supreme Court in reversing stated, 318 U.S. at page 57, 63 S.Ct. at page 446:

"The Circuit Court distinguished between assumption of risk as a defense by employers against the consequence of their own negligence, and assumption of risk as negating any conclusion that negligence existed at all."

That, in our view, is precisely what the Supreme Court did in Aeby. The Supreme Court in Tiller, in response to the reasoning of the Circuit Court of Appeals, stated, 318 U.S. at page 58, 63 S.Ct. at page 446:

"We find it unnecessary to consider whether there is any merit in such a conceptual distinction between aspects of assumption of risk which seem functionally so identical, and hence we need not pause over the cases cited by the court below, all decided before the 1939 amendment, which treat assumption of risk sometimes as a defense to negligence, sometimes as the equivalent to non-negligence."

Following this statement the court cites in a footnote the Aeby case as one which had treated assumption of risk "as the equivalent of non-negligence." The court on the same page continued:

"We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to 'non-negligence'."

The Supreme Court in Tiller, in holding that the issue of negligence was one for the jury, stated, 318 U.S. at page 67, 63 S.Ct. at page 451:

"It is a general rule that a railway company is not liable to its em-

"* * * the employer's liability is to be determined under the general rule which defines negligence as the lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done."

It is true, as pointed out by defendant, that the Aeby case was cited with approval in Detroit, T. & I. R. Co. v. Banning, 6 Cir., 173 F.2d 752, 755, and in McGivern v. Northern Pac. Ry. Co., 8 Cir., 132 F.2d 213, 217. We do not understand, however, that the court in either of these cases relied upon the reasoning upon which the result in Aeby was predicated. In any event, in the light of Tiller, we think the basis for the decision in Aeby is without force.

Of the many cases cited by plaintiff, the one closest in point from a factual standpoint is Fort Worth & Denver City R. Co. v. Smith, 5 Cir., 206 F.2d 667. There the plaintiff's decedent, a switchman, was employed in the extensive switching yard of the defendant railway. On the day he reported for work the entire yard area was covered with snow, ice and sleet. He received the injuries complained of when he slipped and fell while walking on the ice covered ground. The court decided adversely to the defendant's contention that there should have been a directed verdict on the issue of negligence. Defendant distinguishes this case on the basis that the icy condition had existed continuously for thirty hours previous to the accident. The opinion discloses, however, that there was continued rain and mist during each six-hour period previous thereto. The court stated the rule with reference to the duty of a railroad company as well as it will be found in any case, so we think. The court said, 206 F.2d at page 669:

"It is a general rule that a railway company is not liable to its em-

ployees for injuries resulting from climatic conditions, such as ice and snow; but within its yard limits it must exercise a degree of care commensurate with the risks to prevent the accumulation of snow and ice in such quantity, form, and location as to be a menace to the safety of its employees working in its yards. * * * The duty of providing a reasonably safe place for the carrying on of the work is a continuing one and must be exercised whenever circumstances demand it."

The many cases discussed by the parties are of little aid because each depends upon its own factual situation. It is certain, however, that the Supreme Court in a number of decisions has extremely limited our scope of review. Illustrative is Bailey v. Central Vermont Railway, Inc., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444. In that case the Supreme Court of Vermont had reversed the trial court for its refusal to direct a verdict on the issue of negligence and that court in turn was reversed by the Supreme Court of the United States. The court, referring to the duty imposed upon railroad companies, said, 319 U.S. at page 353, 63 S.Ct. at page 1064:

"As stated by this Court in the Patton case [179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361] it is a duty which becomes 'more imperative' as the risk increases. 'Reasonable care becomes, then, a demand of higher supremacy, and yet, in all cases it is a question of the reasonableness of the care, reasonableness depending upon the danger attending the place or the machinery.' * * * That duty of the carrier is a 'continuing one' (Kreigh v. Westinghouse & Co., supra, 214 U.S. page 256, 29 S.Ct. page 622, 53 L.Ed. 984) from which the carrier is not relieved by the fact that the employee's work at the place in question is fleeting or infrequent."

The court on the same page, referring to the issue of negligence stated:

"The debatable quality of that issue, the fact that fair-minded men might reach different conclusions, emphasize the appropriateness of leaving the question to the jury. The jury is the tribunal under our legal system to decide that type of issue * * *."

And on the following page the court, referring to the right to a trial by jury, stated:

"It is part and parcel of the remedy afforded railroad workers under the Employers' Liability Act. Reasonable care and cause and effect are as elusive here as in other fields. But the jury has been chosen as the appropriate tribunal to apply those standards to the facts of these personal injuries. * * * To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them." 63 S.Ct. 1064.

■ We are convinced that this is a close and doubtful case on the issue of negligence. The colloquy between counsel and the trial court during the argument on the motion for a directed verdict indicates that the trial judge shared this view even though he refused a motion to direct. The issue of negligence, however, was again raised on defendant's motion for judgment notwithstanding the verdict. At that time the trial judge not only had the benefit of oral argument, but briefs were submitted by the respective parties. That the trial judge gave the question careful consideration is evidenced by his memorandum opinion, in which he held that the issue was properly submitted. While the defendant makes a plausible and in some respects persuasive argument to the contrary, we are not convinced that the trial court erred in its refusal to direct a verdict or in the denial of the motion for judgment notwithstanding the verdict. The defendant's contention on this point is, therefore, denied.

■ Defendant's contention that the proof was insufficient to take the case

to the jury on the issue of proximate cause has little if any merit. We have read the testimony as it relates to the nature of plaintiff's injuries and we think it clearly presented a jury issue. While during the months following his injury he worked spasmodically, yet he spent much time in various hospitals and was constantly under the care of physicians, a part of the time those of defendant. During all the time he complained and suffered from pains in his back and left shoulder. It is true that his injury was for the first time diagnosed as a ruptured intervertebral disc on September 20, 1950, although the physician who made such diagnosis stated that he had suspected the cause of his difficulty several weeks previously. An operation was performed on September 25, 1950, which verified the diagnosis. The attending physician who made the diagnosis and who had treated the plaintiff for months prior thereto, in response to a hypothetical question stated, "I feel very definitely it [the fall on January 4, 1950] was the initiating cause to the condition as proven to be there." Defendant argues that an "initiating" cause is not the same as the "proximate" cause. We think this is a distinction without a difference when considered in connection with the other circumstances and facts in the case.

■ Defendant tendered an instruction, refused by the court, which included the following statement:

"You are instructed that the defendant was under no duty to remove ice and sleet in the Mill Yard or to take any other corrective action with respect to the ice and sleet until a reasonable time had elapsed after the freezing rain had ceased."

This is a good argument but we think it is an incorrect statement of law. Defendant, as heretofore shown, was under a continuing duty to exercise reasonable care in furnishing plaintiff a reasonably safe place to work, and whether such care required it to take action prior to the cessation of the storm was a matter for the jury's consideration.

■ A more serious question arises from certain portions of the court's charge relative to the duty owed by the defendant to its employees. The complaint alleged that it "became and was the duty of the defendant to afford the plaintiff a reasonably safe place to work and to exercise all due care for the safety of the plaintiff." Defendant in its answer denied this allegation and alleged "that its only duty in that respect was to exercise reasonable care to provide the plaintiff with a reasonably safe place to work and to exercise ordinary care for the safety of the plaintiff." The court, in summarizing the issues made by the pleadings, stated that the defendant "admits that it was its duty to provide a reasonably safe place to work." It is plain that the defendant made no such admission. The court also charged the jury, "The employer in a case such as this owes the positive duty to an employee to provide him with a reasonably safe place in which to work."

■ That the jury was thus erroneously instructed upon a vital point is not open to controversy. The correct rule as announced in many cases is, as the defendant conceded in its answer, that an employer is under the duty to use reasonable care in furnishing his employees with a reasonably safe place to work. Bailey v. Central Vermont Railway, Inc., 319 U.S. 350, 352, 63 S.Ct. 1062, 87 L.Ed. 1444; Seaboard Air Line Railway v. Horton, 233 U.S. 492, 34 S.Ct. 635, 58 L.Ed. 1062; Atlantic Coast Line R. Co. v. Dixon, 5 Cir., 189 F.2d 525, 527 (and cases therein cited). In the Horton case an instruction which placed upon the defendant an absolute duty to provide a reasonably safe place for plaintiff to work was held erroneous. In commenting thereon the court stated, 233 U.S. at page 502, 34 S.Ct. at page 639:

"To hold that under the statute the railroad company is liable for the injury or death of an employee resulting from any defect or insufficiency in its cars, engines, appliances, etc., however caused, is to

take from the act the words 'due to its negligence.' The plain effect of these words is to condition the liability upon negligence * * *. The instructions above quoted imposed upon the employer an absolute responsibility for the safe condition of the appliances of the work, instead of limiting the responsibility to the exercise of reasonable care."

In the Dixon case the court stated, 189 F.2d at page 526:

"The Federal Employers' Liability Act does not make the employer an insurer of the safety of its employees while they are on duty. The employer is not held to an absolute responsibility for the reasonably safe condition of the place, tools and appliances, but only to the duty of exercising reasonable care to that end, the degree of care being commensurate with the danger reasonably to be anticipated. [Citing cases.]"

In the same case an instruction which in effect placed an absolute duty upon the railroad was held to be reversible error. With reference thereto the court stated, 189 F.2d at page 528:

"This charge is faulty in that it presents, as the sole criterion of liability, knowledge of the employer or its representative that the place or tools provided for the employee's use were unsafe, rather than the failure on the part of the employer to exercise reasonable care and prudence to that end, which is the recognized test."

Plaintiff makes no serious, certainly no successful effort to refute defendant's contention that the jury was thus erroneously instructed. Reliance is placed, however, upon the argument, often advanced and sometimes accepted, that the court's charge must be considered as a whole and when so considered the jury could not have been misled. In other words, the error contained in the charge could not have affected the result and was, therefore, not prejudicial. It is true that in other portions of the

charge the jury was correctly informed as to the duty of the defendant, that is, that it had the responsibility of using reasonable care to furnish its employees with a reasonably safe place to work.

This argument that the erroneous portions of the charge were not prejudicial might be accepted in a case where the proof of negligence was strong, and particularly in a case where it was overwhelming. However, as we have previously indicated, this is not such a case. The most that can be said is that the proof was sufficient, as we have held, to justify a submission of the issue to the jury.

Under such circumstances, the court's erroneous statement that the defendant was under a positive duty to furnish plaintiff with a reasonably safe place to work might have, certainly it could have, been the deciding factor. The erroneous statement in effect made the defendant an insurer because, as indicated in the Horton case, supra, it removed from the Act the words "'due to its negligence.'"

The judgment is reversed and the cause remanded for a new trial.