IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 10, 2004 Session

## BILL FOX, ET AL. v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission, Eastern Division**
**No. 20101550      Vance W. Cheek, Jr., Commissioner**

---

### No. E2003-02024-COA-R3-CV  - FILED OCTOBER 27, 2004

---

In this premises liability action, Debby Fox ("the plaintiff")[1] and her husband, Bill Fox, filed a claim against the State of Tennessee ("the State") for damages sustained by the Foxes when the plaintiff was injured as a result of a fall from a stage during a play rehearsal on the campus of the University of Tennessee at Knoxville ("UT").  The claims commission found in favor of the State, holding (1) that the plaintiff failed to prove her claim of negligence and (2) that she was guilty of 100% of the fault in the accident.  The plaintiff and her husband appeal, arguing, *inter alia*, that the evidence preponderates against the claims commission's determinations.  We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Affirmed; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

W. Andrew Fox, Knoxville, Tennessee, for the appellants, Bill Fox and Debby Fox.

Ronald C. Leadbetter, Knoxville, Tennessee, for the appellee, State of Tennessee.

### OPINION

#### I.

In the spring of 2000, Renee Haralson, a senior at UT, directed a play on the UT campus to satisfy a required component of her theatre major.  Cast members included UT students as well as non-students with whom Ms. Haralson had worked on previous theatrical projects.  The play was set to be performed at the Carousel Theatre, which, as its name suggests, is a theatre-in-the-round. The plaintiff, a non-student, was a cast member in the play.

---

[1]When we refer to the plaintiff in the singular, we are referring to the injured party, Debby Fox.

The plaintiff had extensive theatre experience. She appeared in her first play shortly after her marriage in 1976. She had acted in some 30 to 35 "full stage productions." Her extensive experience in local theatre led her to appear in productions at the Oak Ridge Playhouse, the Tennessee Theatre, the Bijou Theatre, and the Clarence Brown Theatre on the UT campus, as well as the Carousel Theatre.

The Carousel Theatre is designed with several concentric descending levels or steps – each of which appear from the photographs in the record to be approximately 3 feet in depth – that encircle the entire theatre; the audience is seated in chairs on each of these steps, with several spaces left for the aisles descending down to a large round area with a concrete floor. Presumably, many theatrical productions are staged in this lower floor area. However, in the case at bar, a raised platform or stage was built on top of the lower few steps of the theatre, which stage encompassed approximately one-fourth of the total area of the circular levels. To give the reader a better understanding of this configuration, we have attached one of the exhibits in the instant case as an appendix to this opinion. The sole purpose of the appendix is to give the reader a general orientation of the layout of the Carousel Theatre.

After Ms. Haralson had assembled her cast, she conducted most of the play rehearsals at a local church. However, approximately one to two weeks prior to the April 26, 2000, opening night, rehearsals were moved to the Carousel Theatre. Once the rehearsals moved to the theatre, the cast and crew had their first rehearsals with stage lights and blackouts; blackouts are often used in a theatre for scene changes, as well as to signify the beginning and end of the play. To assist the actors and stagehands who must maneuver and place sets and props on the stage during the blackout, "glow tape" is placed on the edges of the set pieces, as well as the edges of platforms and steps, among other things. Glow tape, which is a staple in the theatre business, is a photoluminescent tape that stores light energy and glows in the dark. At one of the rehearsals in the theatre, which occurred either on April 20, 2000, or April 21, 2000, cast member Lisa Slagle complained to the stage manager that she could not see to make one of her entrances – that the stage was too dark and that there was not enough glow tape placed on the set pieces near her entrance. She reported that the lack of glow tape had caused her to stumble into the pieces of the set and fall.

On Saturday, April 22, 2000, the cast and crew gathered for what was apparently the first full dress rehearsal. Prior to the rehearsal, the cast met with Ms. Haralson to go over the notes she had made during the previous rehearsal; the cast was gathered in the audience area of the theatre. At the meeting, Ms. Haralson mentioned that more glow tape had been placed on the set in response to Lisa Slagle's complaint. After she had reviewed her notes with the cast and crew, she called for "places" and the rehearsal was set to begin.

The plaintiff's initial entrance was not to be on the stage proper; rather she was scheduled to enter the theatre by way of one of the descending aisles, some distance from the stage itself. In other words, her initial appearance would be down an aisle with audience members sitting on either side of her. She would be entering, in the parlance of the theatre, from the wings at "stage right." From the perspective of the audience in front of the stage, she would be entering from the left of the

stage complex. However, rather than taking her place in the right wings, the plaintiff discovered that she needed some props in order to make her entrance and headed backstage to retrieve, among other things, a purse from the prop room. The prop room was located to the rear of the theatre. Once she reached the prop room, she discovered that it was locked. At that point, the plaintiff decided she could use her own purse, which she had left in the audience area of the theatre – a point almost exactly opposite from the spot from which she was to make her entrance.

When the plaintiff left the back hallway where the prop room was located, she discovered that the theatre was pitch black. Ms. Haralson had called for a blackout, but the plaintiff did not hear this as it apparently occurred while she was in the hallway behind the theatre. When the plaintiff later described the level of darkness, she stated that she was "shocked when [she] saw how black it was out there." In spite of the total darkness, the plaintiff made the decision to retrieve her purse from the audience area in front of the stage before positioning herself for her entrance. It appears that the plaintiff's plan was to proceed down the steps of one of the aisles that was adjacent to the state – to her stage right – until she reached the concrete floor of the theatre, and then cross the concrete floor to the audience section where her purse was located.

When the plaintiff reached stage right, she came upon steps that were marked at the edge with glow tape. The plaintiff slowly made her way down the steps. When she reached an area that had no glow tape, the plaintiff assumed that she was standing on the concrete floor of the theatre and began walking forward. However, the plaintiff was actually standing on the stage, which apparently was on the same level as one of the steps; we can only conclude that, rather than walking down the steps in a straight line, the plaintiff unknowingly was walking in a diagonal fashion, which caused her to unwittingly end up on the stage. After taking approximately five steps, the plaintiff walked off the front of the stage and fell to the concrete floor, causing her to sustain a badly broken ankle.

As a result of her injury, the plaintiff filed her claim against the State, claiming that UT was negligent in that it failed to place glow tape on the edge of the stage. The plaintiff claims that if the stage had been edged with glow tape, she would have realized that she was not standing on the concrete floor and consequently, she would not have fallen and sustained her injury. Mr. Fox joined his wife's claim, seeking damages for loss of consortium. The State answered the Foxes' joint claim, denying all claims of negligence.

The claims commission heard the case in May, 2003. Following the hearing, the commissioner entered a judgment, finding that the plaintiff had failed to prove that the State was negligent in its placement of glow tape. As an alternative holding, the commissioner opined that the plaintiff was 100% at fault in the accident. From this judgment, the plaintiff and her husband appeal.

II.

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness as to the trial court's factual determinations – one that we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d);

*Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Our review of questions of law is *de novo* with no presumption of correctness attaching to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

### III.

The plaintiffs raise four issues on appeal, which we think can be succinctly stated as follows:

> 1. Does the evidence preponderate against the claims commission's finding that the plaintiff failed to prove that the State was liable to her under a premises liability theory?

> 2. Does the evidence preponderate against the claims commission's finding, under a comparative fault analysis, that the plaintiff was 100% at fault?

> 3. Did the trial court err in allowing witnesses Renee Haralson and Laura Simms to offer their opinion testimony, as said witnesses were not qualified as experts under Tenn. R. Evid. 702?

We will address each of these issues in turn.

### IV.

### A.

The plaintiff's primary assertion on appeal is that the evidence preponderates against the claims commission's holding that the plaintiff failed to prove that the State was liable to her under a premises liability theory. We agree with the conclusions reached by the claims commission.

The plaintiff brought her claim under Tenn. Code Ann. § 9-8-307 (Supp. 2003), which provides, in pertinent part, as follows:

> (a)(1) The commission or each commissioner sitting individually has exclusive jurisdiction to determine all monetary claims against the state based on the acts or omissions of "state employees," . . . , falling within one (1) or more of the following categories:

> \* \* \*

(C) Negligently created or maintained dangerous conditions on state controlled real property. The claimant under this subsection must establish the foreseeability of the risks and notice given to the proper state officials at a time sufficiently prior to the injury for the state to have taken appropriate measures;

\* \* \*

(H) Negligent construction of state sidewalks and buildings;

\* \* \*

(c) The determination of the state's liability in tort shall be based on the traditional tort concepts of duty and the reasonably prudent person's standard of care.

Tenn. Code Ann. § 9-8-307. Thus, in order to prevail under this statute, a plaintiff must prove all of the elements of negligence:

(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation.

*Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998).

The plaintiff argues that the State was negligent in failing to place glow tape "along the edge of the elevated stage, which would warn of the dangerous condition of the elevated stage." Moreover, the plaintiff contends that the State was put on notice of the dangerous condition when cast member Lisa Slagle complained about the lack of glow tape on set pieces just a day or two before the plaintiff's accident.

In determining that the plaintiff failed to carry her burden of proving negligence on the part of the State, the claims commission relied heavily upon the case of *Hames v. State*, 808 S.W.2d 41 (Tenn. 1991). In *Hames*, a golfer's widow brought a claim for wrongful death against the State. Her husband had been struck by lightning and killed while on a State-owned golf course. *Id.* at 42, 43. The plaintiff brought her claim under Tenn. Code Ann. § 9-8-307(a)(1)(C), on the theory that the State was negligent in failing to provide lightning-proof shelters or warning devices on the golf course. *Id.* at 42, 43. The claims commission found in favor of the State, ruling that there was "no industry standard requiring storm shelters or warning devices and that 'common knowledge tells one that lightning is dangerous.'" *Id.* at 43. This court reversed, finding, *inter alia*, that the State had notice of the dangerous condition. *Id.*

The Tennessee Supreme Court reversed the Court of Appeals, and stated the following:

> It is also significant that there is no industry standard to implement warning devices or shelters that are lightning proof; indeed, the proof clearly reveals that most golf courses do not contain either warning devices or lightning proof shelters. Customary conduct, while not conclusive or controlling, may be considered as furnishing a standardized gauge and as one circumstance to be weighed along with all others in determining whether or not ordinary care has been exercised. . . . In sum, we hold that the defendant's conduct did not fall below the applicable standard of care, reasonableness under all the circumstances, and thus there was no negligence.

*Hames*, 808 S.W.2d at 45-46 (internal citation omitted).

In the instant case, the claims commission analogized *Hames* to the plaintiff's case, pointing out that the plaintiff's own expert witness testified that there was no industry standard for the placement of glow tape. Indeed, the claims commission found that the placement of glow tape was a "fluid process" and was applied as cast and crew members requested it. With respect to the edge of the stage, the commissioner specifically found that there was no industry standard "requir[ing] the application of glow-tape on the stage boundary." Accordingly, the claims commission found that the plaintiff had failed to prove the existence of a duty owed to the plaintiff with respect to the placement of glow tape, and, as a consequence of that finding, that the plaintiff's "fall and resulting injury were unfortunate accidents that do not amount to the legal definition of negligence on the part of the State of Tennessee."

B.

In the case at bar, the State owed the plaintiff a duty of reasonable care under all of the circumstances, *i.e.*, a duty "to maintain [its] premises in a reasonably safe and suitable condition." *Eaton v. McLain*, 891 S.W.2d 587, 593 (Tenn. 1994). To borrow language from *Eaton*, this duty "included the responsibility of either removing or warning against any latent dangerous condition on the premises of which the [State was] aware or should have been aware through the exercise of reasonable diligence." *Id*. at 594. As the Supreme Court instructed in *Eaton*, the facts of the instant case require us to determine whether the general duty outlined above includes a more "specific responsibility," which, based upon the allegations in the instant case, would be the duty to place glow tape at the front edge of the elevated stage.

The question of whether, in a negligence case, a defendant owes a duty of care to the plaintiff is a question of law for the court. *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). In the *Eaton* case, the Supreme Court extensively addressed the correct analysis regarding duty of care in a negligence action. In part, it said the following:

The term reasonable care must be given meaning in relation to the circumstances. [citation omitted]. Ordinary, or reasonable, care is to be estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury. [citation omitted]. The risk involved is that which is foreseeable; a risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable. Foreseeability is the test of negligence. If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negligence and no liability. "The plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the [defendant's] power more probably than not would have prevented the injury." [citation omitted].

\* \* \*

The pertinent question is whether there was any showing from which it can be said that the defendants reasonably knew or should have known of the probability of an occurrence such as the one which caused the plaintiff's injuries.

*Eaton*, 891 S.W.2d at 594 (quoting *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992) (citations in *Doe* omitted in *Eaton*).

The trial court concluded – and we are here again borrowing language from *Eaton* – that the plaintiff "failed to submit legally sufficient evidence as to the duty element of [the plaintiff's] claims of negligence." *Eaton*, 891 S.W.2d at 593. Our review of the record persuades us that the trial court was correct in concluding, as a matter of law, that, based upon the record before the commission and now before us, the plaintiff failed to establish that the State owed a duty to her to place glow tape at the site of the plaintiff's accident at the time she fell off the stage.

The plaintiff contends that the State was put on notice of this dangerous condition, *i.e.*, the lack of glow tape on the edge of the stage, when cast member Lisa Slagle complained about the lack of glow tape on set pieces at a rehearsal just prior to the rehearsal during which the plaintiff fell. However, the fact that a cast member requested the placement of glow tape on pieces of a set *that were some distance from the edge of the stage* certainly does not give rise to notice that there was any dangerous condition in another part of the stage. Ms. Slagle's complaint has no bearing on the issue of whether the lack of glow tape at the edge of the stage was a danger of which the State was on notice.

The issue of duty of care "involves an analysis of the foreseeability of the risk to which [the plaintiff in the instant case] was exposed." *Eaton*, 891 S.W.2d at 594. This analysis prompts the following inquiry: Has the plaintiff made a "showing from which it can be said that the *defendant*[] *reasonably knew or should have known of the probability of an occurrence such as the one which caused [her] injuries.*" *Id*. at 594 (quoting *Doe*, 845 S.W.2d at 178 (emphasis in *Eaton*).

When the theatre was placed in complete darkness, none of the actors were to be on the stage. Furthermore, according to the script, none of the actors were to move onto the stage until after the lights had come up. As pertinent to the claim before us, the plaintiff was to enter the theatre from a point some distance from the stage, *i.e.*, at the top of one of the descending aisles. The State did not know, and had no reason to foresee, that the plaintiff, an experienced actor, *would venture into the dark at a place where she was not supposed to be*. There was no reason to believe that the lack of glow tape at the edge of the stage, even when the stage and the surrounding environs were in complete darkness, was a danger when no one was to be on the stage, or enter the elevated stage, until the lights came back up. Accordingly, we agree with the trial court that the plaintiff has failed to present legally sufficient evidence to establish the duty alleged in her claim. In our judgment, the application of the duty analysis found in *Eaton* to the facts of this case is a complete answer to the plaintiff's first issue.

C.

The plaintiff next contends that the evidence preponderates against the claims commission's finding that she was 100% at fault. While the plaintiff acknowledges that she had a duty to act reasonably under the circumstances, she asserts that navigating in the dark is simply a part of an actor's job and that, as an actor, she must rely upon the crew to do its job properly. Thus, she argues that the failure of the crew to place glow tape in the appropriate places contributed more to her injury than did any negligence on her part.

The claims commission recognized that, in finding that the plaintiff had failed to prove the element of duty, the negligence inquiry had ended and there was no need to address the issue of comparative fault. However, in *obiter dictum*, the commissioner noted that had the plaintiff been successful in making out a claim for negligence, "any negligence on the [p]art of [the plaintiff] would equal or exceed any negligence of the State." The claims commission went on to state the following:

> Her own negligence for knowingly entering a darkened hall and electing to descend a flight of stairs was the proximate cause of her accident and far exceeded any potential negligen[ce] on behalf of the State. Given the facts and circumstances of this Claim, the Commission **FINDS** that [the plaintiff] did have an opportunity to avoid the dangers presented her and therefore the Commission **HOLDS** that one hundred percent (100%) of the liability for [the plaintiff's] injury rests upon her shoulders.

(Capitalization and bold print in original).

Under Tennessee's doctrine of modified comparative fault, the question for the court to consider is whether "the fault attributable to [the] plaintiff [is] equal to or greater than the fault attributable to the defendant." **Eaton**, 891 S.W.2d at 590 (emphasis in original omitted). Thus, a finding that a plaintiff is 100% at fault is no different, in legal effect, than a finding that a plaintiff is 50% at fault – in either situation, the plaintiff's recovery is barred.

If it were to be determined in the instant case that the State did owe a duty to the plaintiff to place glow tape at the edge of the elevated stage, we still hold that the plaintiff cannot recover. This is because we find that the evidence does not preponderate against the claims commission's finding that the plaintiff's fault equaled or exceeded any fault on the part of the State. While the plaintiff, upon realizing that the theatre was pitch black, could have asked the stage manager to raise the lights so she could see her way, she chose not to do so. Instead, she chose to proceed in total darkness. We are not persuaded – nor was the claims commission – by the plaintiff's assertion that it would have been improper for her to stop the rehearsal and ask for lights. Indeed, the plaintiff's own expert admitted at trial that safety concerns would outweigh the impropriety of stopping a dress rehearsal. Moreover, by the plaintiff's own testimony, the rehearsal had not yet begun when she fell. We fail to see how asking for lights at that time would have in any way hindered the rehearsal or adversely affected the plaintiff's reputation as an actor. We therefore hold that the evidence preponderates in favor of the finding that the plaintiff was 50% or more at fault in this case.

D.

The plaintiff asserts that the claims commission erred in permitting Ms. Haralson and Lisa Simms to give opinion testimony as, according to the plaintiff, they had not been qualified as expert witnesses in accordance with Tenn. R. Evid. 702.[2] With respect to Ms. Haralson, the plaintiff objected to her testimony as to where glow tape should be placed based upon "her experience as a director." Likewise, the plaintiff objected to the testimony of Ms. Simms pertaining to her experience with the rules governing the interruption of dress rehearsals. The plaintiff contended that this, too, was expert testimony given by one not properly qualified.

Both witnesses were qualified by "experience" to "testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. We find no error in the trial court's receipt of this evidence. Even if in error, the admission of this evidence did not "involv[e] a substantial right [that] more probably than not affected the judgment." Tenn. R. App. P. 36(b).

---

[2]Tenn. R. Evid. 702 provides as follows:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

E.

The State argues that Ms. Haralson and others involved in the production of the play were not employees or agents of the State. Hence, so the argument goes, the State is not responsible for the negligent acts, if any, of those individuals. In view of our rulings with respect to the issues of duty and comparative fault, we do not find it necessary to reach the State's issue.

V.

The judgment of the claims commission is affirmed. This case is remanded for the collection of costs assessed below, pursuant to applicable law. Costs on appeal are taxed to the appellants, Bill and Debby Fox.

_____
CHARLES D. SUSANO, JR., JUDGE