IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Submitted on Briefs, January 9, 2007

# GARNETT LYNN GOFORTH, R. LYNN GOFORTH and wife, SUSAN D. GOFORTH v. STATE OF TENNESSEE

**Direct Appeal from the Tennessee Claims Commission, Eastern Grand Division**
**No. 20101497     Hon. Vance W. Cheek, Jr., Judge**

---

**No. E2006-00926-COA-R3-CV  - FILED FEBRUARY 22, 2007**

---

Plaintiffs, parents and son brought suit against the University for injuries to the son sustained while practicing football, charging the coaches were negligent in allowing practice to continue under dangerous conditions.  The Commissioner ruled in favor of the University, except as to the dispute over insurance, and awarded plaintiffs $3,600.00 under the contract of insurance with the University.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Claims Commission Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

Thomas C. Jessee, Johnson City, Tennessee, for appellants.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Heather C. Ross, Nashville, Tennessee, for appellee.

**OPINION**

Plaintiffs, Garrett Lynn Goforth, and his parents, R. Lynn Goforth and Susan D. Goforth, sued East Tennessee State University in the Claims Commission and alleged that the son was a scholarship athlete participating in the school football program in 2000, and that while practicing football on April 8, 2000, he was severely injured , sustaining permanent injuries to his neck and back.

The Complaint alleges that the son's coaches were negligent in their training and

direction of the team, and were negligent in allowing practice to continue in severe weather, which contributed to the son's injury. Also that the defendant had failed to comply with the requirements of the insurance which it agreed to provide to the son as a member of the football program, in that defendant had failed to process claims, and had failed to maintain sufficient coverage to keep plaintiffs' insurance rates from increasing in the event of an injury.

Defendant Answered, denying any negligence, and asserted that the son assumed the risk of playing football, and that all medical payments had been made for which the University was properly responsible, and that comparative fault would apply.

At the hearing before the Commissioner, numerous witnesses testified for the plaintiffs and defendant.

Following Trial, the Commissioner found in favor of the defendant on all claims except the claim that defendant was negligent in failing to promptly pay the medical bills, and caused plaintiffs' insurance premiums to increase, and thus awarded $3,600.00 for the increased premiums to the plaintiffs, and dismissed the remaining claims.

The Commissioner found that the son was recruited to play football at the University and received a partial scholarship. He said the son received a packet of materials from the University which included the Possibility of Serious Injury Notice, and a letter to the parents of student-athletes regarding athletics, accidents, and medical insurance. He found that the son was red-shirted his freshman year, which left him four years of eligibility. Under the terms of the Injury Notice, the family's insurance was to be primary, and the University's insurance was secondary. He also said that the son met with coach Hamilton, and Hamilton told him that any potential increase in his scholarship would depend on his play in spring practice. Further, that the son, although undersized, decided to play defense and use his red-shirt year to get more time in the weight room and more training, and that he played linebacker as one of his positions during spring practice.

The Commissioner found that on April 8, 2000, the University football program held a scrimmage practice game, and called Southern Conference officials to referee the game. The Commissioner said that the officials came from the Southeast, and that there was a steady, cold, early spring rain that day, which caused the field to be in bad condition, especially as it related to mud. The Commissioner found that Hamilton testified it was as muddy a field as he had ever seen. He said the coaches and players testified that it was normal to play in wet, muddy conditions, as well as extreme cold, wind, fog, heat and snow. The Commissioner stated he watched the videotape of the scrimmage, and could see the condition of the field, could see the mud on the players' jerseys and helmets, and further observed that it was "just one big messy day" and that the injury occurred when the son was in an "off tackle fullback veer" and that the son did what he was supposed to do, which was fill the hole in the offensive line, and as he made the tackle, his feet slipped out from under him and his helmet contacted the fullback in the thigh. As a result, the son was seriously injured.

The Commissioner found that the University was slow in paying its share of the bills, which caused problems for the plaintiffs, but the University continued to pay his scholarship, as it was obligated to do.

The Commissioner noted that plaintiffs relied on Tenn. Code Ann. §9-8-307 (a)(1)(C), which refers to dangerous conditions on state controlled real property. The Commissioner ruled that in viewing the tape, he could not conclude that the condition of the field was unreasonably dangerous, because "football fields get muddy". As to the charge that the coaching staff was negligent in allowing the practice to go on, he held that the University had a duty to exercise care of their student-athletes and keep them free from harm, but the University did not breach that duty in this case, and that the coaches had taught proper tackling techniques. Finally, he found the parties had a written agreement that the plaintiffs' insurance premiums would not increase, but they had increased by $150.00 per month, and as a result, the Commissioner awarded $3,600.00 in damages for the breach of that agreement by the University.

These issues are raised on appeal:

1.  Whether the Commissioner erred in failing to find that a preponderance of the evidence established that the coaching staff was negligent in allowing practice to continue in the conditions which existed on the date in question?

2.  Whether the Commissioner erred in failing to find that a preponderance of the evidence established that the coaching staff was negligent in its teaching of tackling techniques, which led to Goforth's injuries?

3.  Whether the Commissioner erred in failing to award Goforth damages for breach of his athletic scholarship because the preponderance of the evidence is in favor of finding a breach?

On appeal, we review the Commissioner's fact finding with a presumption of correctness, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). However, questions of law are reviewed *de novo* with no presumption of correctness.

Tenn. Code Ann. §9-8-307(a)(1)(C) permits a claim against the State for negligently creating or maintaining a dangerous condition on State property. *Id.* at (E). Plaintiffs rely on the foregoing statutory provisions and assert the evidence preponderates against the Commissioner's findings.

As the Commissioner noted, the plaintiffs were required to show that the field was in an unreasonably dangerous condition, or that the players were "negligently controlled" by the coaches in being made to practice in such conditions. Plaintiffs argued the proof showed that the conditions on the field were unreasonably dangerous. The proof was that the field was wet and muddy, but all witnesses except the plaintiff testified that games had been played and practice had

been held under worse conditions, and the video demonstrated that the field was wet, and appeared muddy in spots, but it could not reasonably be concluded from the video that the field was in an unreasonably dangerous condition.

As the Supreme Court stated in *Hames v. State*, 808 S.W.2d 41, 44 (Tenn. 1991):

The Plaintiff has the burden of establishing that the State negligently created or maintained a dangerous condition on the [property] and further that foreseeability of the risks and notice had been given to proper State officials at a time sufficiently prior to the injury to enable appropriate remedial measures. T.C.A. § 9-8-307(a)(1)(C). The statute itself provides that the State's liability is to be predicated upon "traditional tort concepts of duty and the reasonably prudent person's standard of care." T.C.A. § 9-8-307(c).

In this case, the proof does not preponderate against the Commissioner's finding that the coaching staff was not negligent in allowing practice to be held on the day in question, and that the condition of the football field was not unreasonably dangerous. Plaintiff admitted that it was not unusual to play in mud or rain, and that he expected to do so, and the son's father recognized this as well, although stating he thought the conditions on that date were extraordinary. All of the other witnesses who were there on that day, however, testified that there was nothing unusual about the weather or field conditions, and the video portrayed the conditions that existed. The son also admitted that he did not complain of the allegedly "dangerous" conditions to anyone, and the evidence does not preponderate against the Commissioner's findings.

Next, plaintiffs argue that the coaching staff was negligent in its teaching of proper tackling techniques, and base their argument solely on the son's testimony that Coach Collins admitted to him at the hospital that he had the linebackers hitting "too low". Further the plaintiffs pointed out, the State did not call Coach Collins to testify, but neither did plaintiffs, and argue that no witness disputed this testimony, but Coach Hamilton, Coach Taylor, and "Doc" Robertson all testified that proper tackling technique required the player to keep his head and eyes up. The son admitted that he was taught this, as it was in his playbook, and that no one on the coaching staff ever told him otherwise. When questioned about Coach Collins' alleged statement, Coach Taylor replied that there was no such thing as being too low on the football field, but that they always taught the players to keep their heads up and eyes open. His testimony was corroborated by Hamilton, Robertson, and the son, as well as the exhibits. Accordingly, the evidence does not preponderate against the Trial Court's finding that proper tackling techniques had been taught to the son.

Finally, plaintiffs argue the State should be held liable for breach of the son's scholarship contract, asserting that Coach Mynatt had advised Mr. Goforth that his son would receive more money on his scholarship after his injury. Contrary to the assertion in plaintiffs' brief, Coach Mynatt was not called to testify. Coaches Hamilton and Taylor testified, however, that only the head coach (Hamilton) could determine whether an athlete would receive a scholarship or an increase in the same. Hamilton denied that any such increase was given, and the written agreement shows that

the son's scholarship was for the fall only, for the 2000-2001 academic year (as it was the previous year).  There is no dispute that that amount was paid, and the Commissioner found, plaintiffs failed to show that a written contract was breached by the State, and this issue is also without merit.

We affirm the Judgment as entered by the Commissioner and remand, with the cost of the appeal assessed to the plaintiffs.

_____
HERSCHEL PICKENS FRANKS, P.J.